BROWNE GEORGE ROSS LLP
Pete Wilson (State Bar No. 35742)
  pwilson@bgrfirm.com
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California  90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

BROWNE GEORGE ROSS LLP
Peter Obstler (State Bar No. 171623)
  pobstler@bgrfirm.com
David S. Wakukawa (State Bar No. 262546)
  dwakukawa@bgrfirm.com
101 California Street, Suite 1225
San Francisco, California  94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

Attorneys for Plaintiff PRAGER UNIVERSITY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PRAGER UNIVERSITY,<br><br>    Plaintiff,<br><br>    vs.<br><br>GOOGLE LLC, a Delaware limited liability company, YOUTUBE, LLC, a Delaware limited liability company, and DOES 1-25,<br><br>    Defendants. | Case No. 5:17-cv-06064-LHK<br><br>**PLAINTIFF PRAGER UNIVERSITY'S OPPOSITION TO DEFENDANTS GOOGLE LLC'S AND YOUTUBE, LLC'S MOTION TO DISMISS**<br><br>Judge:   Hon. Lucy H. Koh<br>Date:    March 15, 2018<br>Time:    1:30 p.m.<br>Crtrm.:  8, Fourth Floor<br>         Robert F. Peckham Federal Courthouse, 280 S. First Street, San Jose, CA 95113<br><br>Trial Date:  None Set |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................................... 3

III.   ARGUMENT ............................................................................................................. 5

    A.     Defendants Are Not Entitled To CDA Immunity ......................................... 6

        1.     Defendants Are Not Entitled To Immunity Under 230(c)(1) ........................ 7

        2.     Defendants Are Not Entitled To Immunity Under 230(c)(2)(B) ................ 12

    B.     Use Of A Purportedly Neutral Filtering Tool Is Not Protected Speech ................ 14

    C.     PragerU Has Sufficiently Alleged State Action ....................................... 18

    D.     The Complaint States A Claim Under The Unruh Act ........................... 20

    E.     The Complaint States A Cause Of Action For Unfair Competition ...................... 22

    F.     The Complaint States A Breach Of The Implied Covenant ................................ 23

    G.     The Complaint States A Claim Under The Lanham Act ......................................... 24

IV.    CONCLUSION ........................................................................................................ 25

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page**

3

<u>**CASES**</u>

4

*Airbnb Inc. v. City and County of San Francisco*,
5
    217 F.Supp.3d 1066 (N.D. Cal. 2016) ...................................................................9

6

*American Bullion, Inc. v. Regal Assets, LLC*,
    2014 WL 7404597 (C.D. Cal. Dec. 30, 2014) .......................................................17

7

*Anesthesia Serv. Medical Group, Inc.*, 200 Cal.App.4th 480 (2011).............................23

8

*Anthony v. Yahoo! Inc.*,
9
    421 F.Supp.2d 1257 (N.D. Cal. 2006) ..................................................................12

10

*ASARCO, LLC v. Union Pac. R. Co.*,
11
    765 F.3d 999 (9th Cir. 2014)..................................................................................14

12

*Barnes v. Yahoo!*,
    570 F.3d 1096 (9th Cir. 2009)................................................................................10

13

*Barrett v. Rosenthal*,
14
    40 Cal.4th 33 (Cal. Ct. App. 2006) ..................................................................19, 20

15

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003)..........................................................................8, 9, 10
16

17

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*,
    481 U.S. 537 (1987) ...............................................................................................20

18

*City of Cincinnati v. Discovery Network, Inc.*
19
    507 U.S. 410 (1993) ...............................................................................................17

20

*ComputerXpress, Inc. v. Jackson*,
21
    93 Cal.App.4th 993 (Cal. Ct. App. 2001) .............................................................19

22

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ...............................................................................................18

23

*Cuviello v. City and County of San Francisco*,
24
    940 F.Supp.2d 1071 (N.D. Cal. 2013) ..................................................................22

25

*Darnaa LLC v. Google, Inc.*,
    2016 WL 6540452 (N.D. Cal. Nov 2, 2016)..........................................................24
26

27

*Darnaa LLC v. Google, Inc.*,
    236 F.Supp.3d 1116 (N.D. Cal. 2017) ..................................................................24

28

## <u>TABLE OF AUTHORITIES</u>
(Continued)

**Page**

*Darnaa, LLC v. Google, Inc.*,
2015 WL 7753406 (N.D. Cal. Dec. 2, 2015) .........................................................................23, 24

*Demetriades v. Yelp, Inc.*,
228 Cal.App.4th 294 (Cal. Ct. App. 2014) ....................................................................................11

*Denver Area Educ. Tele Communications Consort., Inc. v. FCC*,
518 U.S. 727 (1996) .......................................................................................................................18

*Diamond Ranch Academy, Inc. v. Filer*,
2016 WL 633351 (D. Utah Feb. 17, 2016) ....................................................................................11

*Doe v. MySpace*,
528 F.3d 413 (5th. Cir. 2008) ........................................................................................................10

*e-Ventures Worldwide, LLC v. Google, Inc.*,
188 F.Supp.3d 1265 (M.D. Fla. 2016) ......................................................................................7, 8, 9

*e-Ventures Worldwide, LLC v. Google, Inc.*,
2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ............................................................................7, 8, 14

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .........................................................................................................21

*eDrop-Off Chicago LLC v. Burke*,
2013 WL 12131186 (C.D. Cal. Aug. 9, 2013) ............................................................................9, 14

*Enigma Software Grp. USA v. Malwarebytes Inc.*,
2017 WL 5153698 (N.D. Cal. Nov. 7, 2017)..................................................................................14

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc)............................................................................... *passim*

*Fashion Valley Mall, LLC v. N.L.R.B.*,
42 Cal.4th 850 (2007)....................................................................................................................19

*Galbraith v. County of Santa Clara*,
307 F.3d 1119 (9th Cir. 2002)........................................................................................................21

*Garcia v. City of Merced*,
637 F.Supp.2d 731 (E.D. Cal. 2008) ..............................................................................................14

*Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp.*,
161 F.R.D. 2 (D. Mass. 1995) ..........................................................................................................5

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Goddard v. Google, Inc.*,
　2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ........................................................................2, 13

*Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n.*,
　26 Cal.4th 1013 (Cal. Ct. App. 2001) ..............................................................................18

*Gonzalez v. Google, Inc.*,
　2017 WL 4773366 (N.D. Cal. Oct. 23, 2017) ..............................................................................10

*Guz v. Bechtel Nat'l Inc.*,
　24 Cal.4th 317 (Cal. Ct. App. 2000) ..............................................................................24

*Hare v. Richie*,
　2012 WL 3773116 (D. Md. Aug. 29, 2012) ..............................................................................11

*Hightower v. City and County of San Francisco*,
　77 F.Supp.3d 867 (N.D. Cal. 2014) ..............................................................................22

*hiQ Labs Inc. v. LinkedIn Corp.*,
　2017 WL 3473663 (N.D. Cal. Aug. 14, 2017) ..............................................................................19

*Hoffman v. Capital Cities/ABC, Inc.*,
　255 F.3d 1180 (9th Cir. 2001) ..............................................................................17

*Howard v. Am. Online Inc.*,
　208 F.3d 741 (9th Cir. 2000) ..............................................................................18, 19

*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*,
　129 Cal.App.4th 1228 (Cal. Ct. App. 2005) ..............................................................................19

*Hy Cite Corp. v. badbusinessbureau.com LLC*,
　418 F.Supp.2d 1142 (D. Ariz. 2005) ..............................................................................11

*Idaho v. Horiuchi*,
　253 F.3d 359 (9th Cir.), *vacated as moot,* 266 F.3d 979 (9th Cir. 2001) ..............................................................................13

*Kirbyson v. Tesoro Refining and Marketing Co.*,
　2010 WL 2382395 (N.D. Cal. June 10, 2010) ..............................................................................22

*Levitt v. Yelp*,
　2011 WL 5079526, *9 (N.D. Cal. Oct. 26, 2011) ..............................................................................9, 12

*Levitt v. Yelp*,
　765 F.3d 1123 (9th Cir. 2014) ..............................................................................5

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Levitt v. Yelp!*,
2011 WL 13153230 (N.D. Cal. March 22, 2011) ........................................................................9

*Long v. Valentino*,
216 Cal.App.3d 1287, 1296-98 (Cal. Ct. App. 1989), cert. denied, 498 U.S. 855
(1990) (affirming) ...................................................................................................................20

*Marsh v. Alabama*,
326 U.S. 501 (1946) ................................................................................................................18

*Mazur v. EBay, Inc.*,
2008 WL 618988 (N.D. Cal. March 4, 2008) .....................................................................11, 12

*MCSi, Inc. v. Woods*
290 F.Supp.2d 1030 (N.D.Cal.2003)  .....................................................................................19

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005).................................................................................................22

*N. Coast Women's Care Med. Grp., Inc. v. San Diego Cty. Superior Court*,
44 Cal.4th 1145 (Cal. Ct. App. 2008) .....................................................................................21

*Nunes v. Twitter*,
194 F.Supp.3d 959 (N.D. Cal. 2016) .......................................................................................12

*Opperman v. Path, Inc.*,
87 F.Supp.3d 1018 (N.D. Cal. 2014) .......................................................................................12

*Packingham v. North Carolina*,
137 S.Ct. 1730 (U.S. 2017) ...............................................................................................15, 20

*Perkins v. Linkedin Corp.*,
53 F.Supp.3d 1222 (N.D. Cal. 2014) .......................................................................................17

*Pirozzi v. Apple Inc.*,
913 F.Supp.2d 840 (N.D. Cal. 2012) .......................................................................................11

*Progressive West Ins. Co. v. Yolo Super. Ct.*,
135 Cal.App.4th 263 (Cal. Ct. App. 2005) ........................................................................22, 23

*Pruneyard Shopping Center v Robins*,
447 U.S. 74 (1980) ..........................................................................................2, 14, 15, 18, 21

*Ralphs Grocery Co. v. Victory Consultants, Inc.*,
17 Cal.App.5th 245 (Cal. Ct. App. 2017), *as modified* (Nov. 6, 2017) ...............................19, 20

1

## TABLE OF AUTHORITIES
### (Continued)

2

**Page**

3

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997) ...........................................................................................13, 15

4

5

*Robins v. Pruneyard Shopping Ctr.,*
    23 Cal.3d 899 (Cal. Ct. App. 1979), aff'd, 447 U.S. 74 (1980)..................................18

6

*Seidman v. Paradise Valley Unified School Dist. No. 69,*
    327 F.Supp.2d 1098 (D. Ariz. 2004) ........................................................................22

7

8

*Sherman v. Yahoo! Inc.,*
    997 F.Supp.2d 1129 (S.D. Cal. 2014) ...................................................................2, 13

9

*Shiamili v. Real Estate Group of New York, Inc.,*
    17 N.Y.3d 281 (N.Y. Ct. App. 2011) ......................................................................11

10

11

*Shulman v. Facebook.com,*
    2017 WL 5129885 (D.N.J. Nov. 6, 2017) ................................................................19

12

13

*Song fi Inc. v. Google, Inc.,*
    108 F. Supp.3d 876 (N.D. Cal. 2015) ...................................................................2, 13

14

*Sonoma County Ass'n of Retired Employees v. Sonoma County,*
    708 F.3d 1109 (9th Cir. 2013).....................................................................................5

15

16

*Spy Phone Labs LLC v. Google Inc.,*
    2016 WL 6025469 (N.D. Cal. Oct. 14, 2016) ......................................................23, 24

17

18

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011).....................................................................................21

19

*Stevens v. Optimum Health Inst.,*
    810 F.Supp.2d 1074 (S.D. Cal. 2001) .......................................................................21

20

21

*Stevo Design, Inc. v. SBR Marketing Ltd.,*
    968 F.Supp.2d 1082 (D. Nev. 2013) ..........................................................................11

22

23

*Storek & Storek, Inc. v. Citicorp Real Estate,*
    100 Cal.App.4th 44 (Cal. Ct. App. 2002) ..................................................................24

24

*Twitter, Inc. v. Sessions,*
    263 F.Supp.3d 803 (N.D. Cal. 2017) .........................................................................20

25

26

*U.S. Western Falun Dafa Ass'n v. Chinese Chamber of Commerce,*
    163 Cal.App.4th 590 (Cal. Ct. App. 2008) ............................................................20, 21

27

28

**TABLE OF AUTHORITIES**
(Continued)

Page

*Weinberg v. Feisel*,
  110 Cal.App.4th 1122 (Cal. Ct. App. 2003) ...............................................19

*Westlake Legal Grp. v. Yelp, Inc.*,
  599 Fed.Appx. 481, 485 (4th Cir. 2015) ....................................................10

*Wilbanks v. Wolk*,
  121 Cal.App.4th 883, 895 (Cal. Ct. App. 2004) .......................................19

*Woodhull v. Meineil*,
  145 N.M. 533 (Ct. App. N.M. 2008)...........................................................11

*Zango, Inc. v. Kaspersky Lab, Inc.*,
  568 F.3d 1169, (9th Cir. 2009)............................................................12, 13

*Zhang v. Baidu.com., Inc.*,
  10 F.Supp.3d 433 (S.D.N.Y. 2014) ...............................................15, 16, 17

**STATUTES**

Community Decency Act, 47 U.S.C. § 230 ...................................................... *passim*

**OTHER AUTHORITIES**

Eugene Volokh & Donald M. Falk, *Google First Amendment Protection for Search
  Engine Search Results,* 8 J.L. Econ. & Pol'y 883 (2012)............................16

Oren Bracha & Frank Pasquale, *Federal Search Commission? Access, Fairness, and
  Accountability in the Law of Search,* 93 Cornell L.Rev. 1149 (2008).......................16

1    Plaintiff Prager University ("PragerU" or "Plaintiff") respectfully submits this Opposition

2  to Defendants Google LLC's and YouTube, LLC's (collectively "Google/YouTube" or

3  "Defendants") Motion to Dismiss filed December 29, 2017 (DKT #31) (the "MTD").

4  **I.    INTRODUCTION**

5    Defendants Google/YouTube argue that all of PragerU's claims fail as a matter of law

6  because, as the private owners of YouTube, Defendants are free to do what they please, whenever,

7  and to whomever, no matter how unfair, unlawful, or discriminatory.  (*See* MTD 1:19-21; 2:17-

8  3:19; 14:23-26).  In asserting their claim that naked title alone entitles Google/YouTube to do as

9  they please, including violate the law, Defendants accuse PragerU of seeking to "fundamentally

10  redefine the relationship between online service providers and their users, transforming YouTube,

11  a private service provider, into a public forum regulated by the same constitutional standards that

12  apply to the government."  (MTD 1:19-21).  That is a gross overstatement that misconstrues the

13  nature and theory of PragerU's claims against Defendants.  YouTube is different from other social

14  media and web service providers because, as Defendants fail to mention in their moving papers,

15  they operate YouTube as a forum dedicated to "freedom of expression" where "everyone's voice

16  may be heard."  (Compl., ¶¶ 3, 28).  In soliciting and inviting the public to use YouTube as a

17  forum for free speech, Defendants can't have it both ways.  Defendants cannot use a supposedly

18  neutral viewpoint filtering tool and restriction criteria to discriminate against political and

19  religious speech, while also holding YouTube out as a place for freedom of expression for all.

20  Consequently, the law provides a remedy for the many serious wrongs that arise from Defendants'

21  illegal conduct, even when Defendants commit that conduct in their capacity as property owners.

22    *First*, Defendants' affirmative defense that they are immune from suit under the

23  Community Decency Act, 47 U.S.C. § 230(c), *et seq.* (the "CDA") from all but the federal First

24  Amendment claim requires an unprecedented construction and expansion of CDA immunity.

25  Subdivision 230(c)(1) does not immunize online service providers who are directly engaging in

26  and responsible for illegal conduct, including discrimination.  *Fair Housing Council of San*

27  *Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1165, 1171 (9th Cir. 2008) (en banc).

28  And subdivisions (c)(2)(A) and (B) are only available for viewpoint neutral "filtering and

restriction" of obscene, lewd, lascivious, violent, or "otherwise objectionable" content, and does not immunize the unlawful censoring of appropriate content that complies with objective legal guidelines and criteria. *See* 47 U.S. § 230(c)(2)(A) and (B).  Even under subdivision (c)(2)(B), Defendants cannot establish that the filtering and restricting of objectively appropriate content through the use of purportedly neutral "technical means" is a restriction on the type of "objectionable content" for which the statute grants immunity. *See Song fi Inc. v. Google, Inc.,* 108 F.Supp.3d 876, 883–84 (N.D. Cal. 2015); *Sherman v. Yahoo! Inc.,* 997 F.Supp.2d 1129, 1138 (S.D. Cal. 2014); *Goddard v. Google, Inc.,* 2008 WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008).

*Second*, Defendants' contention that the First Amendment protects discrimination, breach of implied contractual obligations, or deceptive and unlawful business practices has been tried and rejected.  The U.S. Supreme Court has long held that government has the right to regulate private property in a manner that complies with the law.  Thus, while a private party that operates a public forum may have a right to dissociate itself from a speaker and/or her speech, the property owner has no right to censor or restrict the actual speech. *Pruneyard Shopping Center v Robins*, 447 U.S. 74, 85-88 (1980).  Furthermore, Defendants' use of Restricted Mode is not the exercise of traditional publishing or editorial function of the right to speak or not.  Defendants' use of Restricted Mode is intended only for the neutral purpose of protecting children from "mature content."  Restricted Mode was not intended to unlawfully censor or discriminate against speech, nor does it allow Defendants to breach their other legal obligations simply because Defendants dislike the user's political viewpoint, religion, or identity.  (*Compare* MTD 1:27-2:7, *with* Compl. ¶¶ 4-15, 29, 32, 41-51, 72, 79).

*Third*, Defendants' argument that PragerU has failed to plead facts sufficient to state any claim for relief is mystifying.  Defendants' argument that PragerU has failed to adequately allege "state action" in support of the free speech claims is refuted by Defendants' public statements and admissions that they operate YouTube as a public forum expressly dedicated to the right of "freedom of expression" for all.  And the use of a nominally "neutral tool" aimed at protecting younger viewers as a mere pretext to restrict all viewer access, based not on the content of the speech, but the political and religious viewpoint and identity of the speaker, is sufficient to state

1  claims for discrimination, breach of the implied covenant of good faith in contract (including

2  Defendants' Mission Statement, Terms of Use, Community Guidelines, and Restricted Mode

3  Criteria), deceptive and unlawful business practices, and violations of the Lanham Act at the

4  pleading stage.

5  **II.      FACTUAL BACKGROUND**

6          Defendants advertise YouTube to PragerU and the public as a forum dedicated to "freedom

7  of expression" and a "community where everyone's voice can be heard" "no matter [] their []

8  point of view." (Compl., ¶ 28). Defendants further represent (and the public trusts) that the use of

9  Restricted Mode is limited to "potentially mature" content, and that when a video is restricted,

10  Defendants do so, in good faith, for the neutral purpose of preventing younger viewers from being

11  exposed to harmful content, that is objectively "mature." (Compl., ¶¶ 42, 104). Specifically,

12  Defendants assure the public that they administer Restricted Mode according to "the principle of

13  anyone having access to important content and different points of view" (Compl., ¶ 41) and, in so

14  doing, "aim to apply the same standards to everyone." (MTD 5:20). It is on the basis of those

15  representations that PragerU and other members of the public rely in deciding to use YouTube and

16  help grow it into the global online video monopoly that it is today. (Compl., ¶¶ 2-3, 11, 112).

17          In this case, PragerU does not challenge the right of social media sites to restrict access to

18  violent, obscene, pornographic, hateful, or objectively harmful content. What PragerU does allege

19  (and the record shows) is that Google/YouTube fail to give all speakers an equal voice "no matter

20  [] their [] point of view," and continue to administer Restricted Mode in ways and for purposes

21  that are unlawful and do not even comply with Defendants' own criteria. Specifically, Defendants

22  use Restricted Mode, and the vague and subjective terminology contained in its criteria, as a

23  pretext to arbitrarily and maliciously discriminate against PragerU on the basis of its identity,

24  viewpoint, and religion. (Compl., ¶ 79). Defendants cannot reasonably claim that all of PragerU's

25  restricted videos violate Defendants' guidelines on restrictions, let alone contain objectionable

26  content. (Compl., ¶57). Yet because of their animus against Plaintiff, and after conducting a

27  manual as well as algorithmic review of PragerU's videos, Defendants cut off PragerU's core

28  audience of students and young people from accessing purely educational videos on the grounds

-3-
OPPOSITION TO MOTION TO DISMISS

that those videos discuss or mention current or historical events involving war, drugs, the
Holocaust, the Middle East, as well landmark court decisions about religion, sexual orientation,
and other topics.  (Compl., ¶¶ 14, 41, 66).  At the same time, videos that are posted by other
speakers with non-conservative viewpoints or identities and address identical topics and are not
subject to any viewer access restrictions despite the existence of content containing profanity,
graphic violence, obscenity, or hate speech inciting violence.  (Compl., ¶¶ 67-68, 72.)

Defendants' conduct is completely at odds with what they represent to the public as well as
to this Court.  Specifically, Defendants represent that to "give effect to the preferences of users
who employ Restricted Mode, YouTube designates certain videos as 'age restricted' or treats them
as 'potentially mature,' including content . . . such as 'graphic depictions of violence . . . even
violence in the news,' and 'events related to terrorism, war, crime, and political conflicts . . . even
if no graphic imagery is shown.'"  Defendants state that the determination to restrict is made in
two different ways: (i) "'an automated filtering algorithm that examines certain 'signals' like the
video's metadata, title, and the language used in the video' to determine whether the video should
be classified as potentially mature or age-restricted[,]" and (2) "human reviewers may apply those
designations after manually reviewing videos that have been flagged by users or classified by the
automated filtering system."  Defendants further represent that the "***the same standards [apply] to
everyone***." (MTD 12:5-27, emphasis added).

The allegations in the Complaint show otherwise.  Defendants' decisions to restrict are
made based on their subjective, unfettered, discretionary whim and are driven by viewpoint bias
that has nothing to do with a fair and objective determination of whether the content may be harmful
to children, practices that are directly at odds with what Defendants tell the public.  (Compl., ¶ 72).
Indeed, since the filing of the Complaint, more evidence of Defendants' discriminatory animus
against conservatives has emerged.  On January 8, 2018, two Google employees filed a class
action accusing Google of rampant and intentional political discrimination against employees.  In
support of the lawsuit, plaintiffs referenced and attached 86 pages of internal posts, emails and
documents that contain jaw dropping communications of blacklisting, intimidation, harassment,
and retribution against persons who hold different political and religious views than those of

Defendants or their senior management.  *See* Request for Judicial Notice ("RJN") Ex. A; *see also* Obstler Declaration in Opposition to MTD ("Obstler Dec.") ¶ 2a-c, Summary Ex. A (both of which are filed herewith) for excerpted examples.[1]  And, in addition to the chart comparing PragerU's video content with content that is not restricted, Defendants do not restrict a series of videos advocating that it is "OK" and permissible to punch a Nazi, replete with graphic footage of persons being assaulted and punched in the face.  *See* Obstler Dec. ¶ 3.  And the disparate treatment of video content based on user viewpoint and identity does not result from the Restricted Mode algorithm not being "perfect," as Defendants contend, but from Google/YouTube's systematic and discriminatory consideration of PragerU's viewpoint and identity. (E.g., Compl., ¶¶ 88-89; MTD 5:20-23).  In addition, Defendants continue to restrict PragerU videos based on manual reviews by employees who face viewpoint intimidation in the workplace and an algorithm that contains viewpoint biased filtering code.  (Compl., ¶¶ 47, 83).  Consequently, Defendants' insistence that the alleged conduct occurs because "'Videos showing such harmful or dangerous acts may get age-restricted or removed depending on their severity'" and "context" are merely pretexts intended to mask Defendants' illegal viewpoint discrimination and other unlawful acts that, at a minimum, should be decided on the merits by the trier of fact.

## III.    ARGUMENT

Defendants fail to show why the allegations in the Complaint, if taken as true, including Defendants' own statements to the public and this Court, are insufficient to state claims for relief as matter of law.[2]  That is particularly true where, as here, Defendants' motion to dismiss is based

---

[1] To the extent that the Court declines to take judicial notice of or consider the new evidence as outside the scope of the pleadings for purposes of adjudicating a motion to dismiss under Rule 12(b)(6), PragerU will respectfully request leave to amend the Complaint to add this additional evidence of illegal conduct.  A court may consider the factual allegations of a proposed amendment in ruling on a motion to dismiss.  *See, e.g.*, *Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp.*, 161 F.R.D. 2, 4 (D. Mass. 1995).  And leave to amend should be freely given to advance the policy of determining cases on their merits.  *Sonoma County Ass'n of Retired Employees v. Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013).

[2] To survive a motion to dismiss, Plaintiff need only plead sufficient allegations of underlying facts to give fair notice and to plausibly suggest an entitlement to relief.  *Levitt v. Yelp*, 765 F.3d 1123, 1135 (9th Cir. 2014).

on the fallacy that Defendants are free to do as they please because they own YouTube, even if they discriminate, breach contracts, deceive users, and engage in unfair and unlawful business practices.  Consequently, Defendants cannot carry their affirmative legal burden of showing that the facts as pleaded entitle them to immunity for their unlawful conduct under the CDA.  Nor can Defendants use naked title over YouTube to invoke a First Amendment defense to further immunize their wrongdoing, including blatant political and religious discrimination.  Finally, the Complaint sets forth sufficient allegations, including Defendants' public admissions, the actual video content at issue, and Defendants' internal communications, from which a trier of fact would find that PragerU is entitled to relief for each of the claims asserted against Defendants.

### A.  Defendants Are Not Entitled To CDA Immunity

Defendants assert that the CDA "includes two distinct immunities for online service providers, which independently bar Plaintiff's claims in this case (other than its claim for violation of the U.S. Constitution, which is precluded by Google's own First Amendment rights and fails on its own terms)."  (MTD 2:17-28).  The CDA, however, actually provides three separate immunities: one for actions that computer services take to publish others' content, under 230(c)(1) (*see* PragerU's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction, (DKT #25) ("PI Mtn.") at 10); a second for the actions taken, like the ones in this case, to filter and restrict objectionable content, under 230(c)(2)(A); and a third for actions taken to make available to others the "technical means" to restrict access to objectionable content, under 230(c)(2)(B).  And although it is the second immunity under subdivision (c)(2)(A) that expressly governs Defendants' restricting and filtering of user content in this case, Defendants have not and cannot meet their affirmative burden for CDA immunity under that or any of the other provisions.  Section 230(c)(2)(A) immunizes an interactive computer service from "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  But according to the Complaint, Defendants are not acting in "good faith."  (Compl., ¶¶ 49-51, 70-72).

In an effort to plead around the "good faith" requirement, Defendants assert two other

1   immunity provisions, subdivisions (c)(1) and (c)(2)(B), neither of which immunizes them based

2   on the allegations in this case.  As set forth in more detail below, (c)(1) does not apply where, as

3   here, the defendant website providers, not third party users, are the sole perpetrators of the illegal

4   and unlawful conduct.  *Fair Housing*, 521 F.3d at 1165, 1177.  And Defendants are not eligible for

5   immunity under (c)(2)(B) because PragerU's content is not obscene, pornographic, or objectively

6   harmful content as defined by the statute.  Indeed, Defendants restrict PragerU's content despite

7   visual evidence that PragerU's content is not "objectionable" under the CDA and does not even

8   violate Defendants' broad written criteria and guidelines.  (Compl., ¶¶ 4, 7-8).  As set forth in

9   more detail below, therefore, Defendants cannot carry their burden of showing they are entitled to

10   immunity under subdivision(c)(1) or (c)(2)(B).

**1.      Defendants Are Not Entitled To Immunity Under 230(c)(1)**

12   Defendants' argument on section 230(c)(1) boils down to a claim that Defendants are

13   immune for any action taken in connection with their efforts to restrict, filter, censor, or

14   demonetize the public's speech, even if those efforts are nothing more than a bad faith attempt to

15   suppress and discriminate against a user's speech in violation of the law.  (MTD 9:12-10:19).

16   Defendants' unbounded construction of that immunity finds no support in the law.

17   As an initial matter of statutory construction, Defendants' arguments would render much

18   of section 230, including subdivision (c)(2)(A), pure surplusage.  Defendants argue that "any

19   action voluntarily taken in good faith to restrict access" is likewise an action taken to "enable or

20   make available to [] others the technical means to restrict access" under (c)(2)(B).  (MTD 10:21-

21   12:21).  Thus, any and all access restrictions can be shoehorned into (c)(2)(B), sidestepping the

22   good faith requirement of (c)(2)(A).  Indeed, Defendants go so far as to contend that all of

23   230(c)(2) is in fact unnecessary, because any action taken to "restrict access" is actually a

24   publisher function that is immune under (c)(1).  (MTD 9:2-10:19).

25   Defendants' attempt to circumvent and effectively eliminate the good faith provision of the

26   CDA by trying to use subdivision (c)(1) to plead around subdivision (c)(2)(A) has been tried by

27   Defendant Google before and rejected.  In *e-Ventures Worldwide, LLC v. Google, Inc.*, 188

28   F.Supp.3d 1265 (M.D. Fla. 2016) and 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017), the court

1    rejected Google's motion to dismiss as well as a motion for summary judgment, based on

2    allegations (and, later, circumstantial evidence) that Google had removed plaintiff's websites from

3    its search results for anticompetitive reasons. 188 F.Supp.3d 1265, 1277.  In so doing, the court

4    also expressly rejected Defendants' insistence that its intent, no matter how maliciously or

5    unlawfully motivated, was irrelevant under 230(c)(1): "interpreting the CDA this way results in

6    the general immunity in (c)(1) swallowing the more specific immunity in (c)(2).  Subsection (c)(2)

7    immunizes only an interactive computer service's 'actions taken in good faith.' If the publisher's

8    motives are irrelevant and always immunized by (c)(1), then (c)(2) is unnecessary. The court is

9    unwilling to read the statute in a way that renders the good-faith requirement superfluous."  2017

10   WL 2210029 at *3; *see also Fair Housing*, 521 F.3d at 1165 ("The CDA does not grant immunity

11   for inducing third parties to express illegal preferences. Roommate's own acts—posting the

12   questionnaire and requiring answers to it—are entirely its doing and thus section 230 of the CDA

13   does not apply to them.").

14          And in *Fair Housing*, an *en banc* panel of the Ninth Circuit held that if an online service

15   provider engages in independent illegality, including publishing material not authorized for

16   posting or discriminating against persons online, then the provider is not entitled to CDA

17   immunity.  521 F.3d at 1171.  Consequently, unlawful or wrongful actions committed by the

18   service provider "in connection with user posts are not immunized," including the asking of

19   "discriminatory questions of users, before any third party content is posted online."  *Id*. at 1165.  A

20   service provider who "edits … such as by correcting spelling, removing obscenity or trimming for

21   length" third party content might gain immunity, but one who "edits in a manner that contributes

22   to the alleged illegality," such as creating a defamatory statement, would not.  *Id*. at 1169.

23   Because the service provider there had "selected the criteria used to hide listings" and instituted a

24   "discriminatory filtering process," it was not entitled to immunity.  *Id*. at 1167, 1169-70.

25          Defendants' quotation from *Fair Housing* that "'any activity that can be boiled down to

26   whether to exclude material that third parties seek to post online is perforce immune'" is

27   misleading and out of context.  (MTD 9:7-8).  Specifically, the quotation was lifted from the

28   court's discussion of *Batzel*, an earlier case that involved a newsletter distributor's decision to

publish or not publish third party content. *Fair Housing*, 521 F.3d at 1170-71 (discussing *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003)). Consequently, as the court makes clear in the very next sentence, if a publisher engages in independently illegal conduct, such as publishing material not given to him for posting online, then it is not entitled to CDA immunity. *Id.* at 1171. That is the case here because Defendants' restriction of PragerU's educational videos occurs through Defendants' discriminatory and unlawful manipulation of an access restriction tool that is not viewpoint neutral. *See eDrop-Off Chicago LLC v. Burke*, 2013 WL 12131186, *24 (C.D. Cal. Aug. 9, 2013) (suggesting that provision of passwords to some users but not others would be inconsistent with providing a "neutral tool" under *Fair Housing*).

The CDA "was not meant to create a lawless no-man's-land on the Internet," where something that is illegal offline is now legal online. *Fair Housing*, 521 F.3d at 1164, 1167. "If such screening is prohibited when practiced in person or by telephone, we see no reason why Congress would have wanted to make it lawful to profit from it online." *Id.* Because Defendants cannot lawfully discriminate against persons, breach contracts, deceive the public, or engage in unfair or unlawful business practices offline, the CDA does not allow Defendants to do the same online.

To that end, the Ninth Circuit has made clear that section 230(c)(1) is only available to "Good Samaritans," not to providers who are alleged to be acting unlawfully and in bad faith. *Fair Housing*, 521 F.3d at 1175. That is why, in *Levitt v. Yelp!*, 2011 WL 13153230, *8 (N.D. Cal. March 22, 2011), Judge Patel held that Yelp's own manipulation of customer reviews to drum up business was not immunized: "Choosing not to publish content for the purposes of harming a particular business or to coerce that business into purchasing advertising seems quite distinct from the traditional editorial functions of a publisher." *See also e-Ventures*, 188 F.Supp.3d 1265, 1273 (anticompetitive removal of websites not "good faith"); *but see Levitt v. Yelp,* 2011 WL 5079526, *9 (N.D. Cal. Oct. 26, 2011) (Chen, J.). Implying some level of "good faith" in an immunity provision expressly reserved for "Good Samaritans" is necessary since the CDA "does not provide limitless immunity for online activity or conduct related to it." *Airbnb Inc. v. City and County of San Francisco*, 217 F.Supp.3d 1066, 1074 (N.D. Cal. 2016).

In any event, none of the cases relied on by Google/YouTube supports Defendants' assertion that PragerU "seeks to do exactly what Section 230(c)(1) forbids . . . [imposing] liability on YouTube as a publisher of Plaintiff's videos."  (MTD 10:7-8.)  Indeed, Defendants' reliance on those cases suggest that Google/YouTube do not understand what they are being accused of in this case.  PragerU is not saying (or even implying) that PragerU's publishing of its videos was wrong.  Rather, PragerU challenges YouTube's unlawful and discriminatory application of Restricted Mode.  The section 230(c)(1) cases cited by Defendants stand only for the proposition that a service provider's posting of third party content does not make the provider liable for the third party's content.  *See, e.g.*, *Batzel*, 333 F.3d 1018 (MTD. at 8:14-25) (defamation claim would not lie against provider of an email list, merely for including a news update in a newsletter); *Zeran, Gonzalez*, *Doe v. MySpace*, and *Westlake Legal* (MTD 9:2-10:19) (interactive computer services immune from liability for merely hosting users' content); *see also Fair Housing*, 521 F.3d at 1157, n.33 (distinguishing *Zeran* on ground that plaintiff sought to hold AOL liable for defamation because AOL hosted a message board where third party content appeared); *Doe v. MySpace*, 528 F.3d 413 (5th. Cir. 2008) (provider immune from liability for allowing, against its rules, a minor to post and meet an adult who later sexually assaulted her, absent any claims of bad faith, unlawful conduct, or discrimination); *Westlake Legal Group v. Yelp, Inc.*, 599 Fed.Appx. 481, 485 (4th Cir. 2015) (CDA barred plaintiffs from holding Yelp legally responsible for information created and developed by third parties, and that the use of an automated filtering software did not transform Yelp into an "information content provider"); *Gonzalez v. Google, Inc.*, 2017 WL 4773366, *13 (N.D. Cal. Oct. 23, 2017) (web site provider immune from not transmitting ISIS recruiting videos on YouTube because plaintiff failed to allege that Google's targeted ad algorithm was "anything but content neutral").

The same is true for cases involving an online provider's editorial decision not to publish.  In *Barnes v. Yahoo!*, 570 F.3d 1096 (9th Cir. 2009), a provider took neutral steps to "de-publish" offensive or fake profiles and the provider obtained immunity because the theory of liability was premised on a violation of a duty that "derive[d] from the defendants' status as a publisher or speaker" of third party content.  *Id*. at 1101-02.  Like *Barnes*, *Sikhs for Justice "SFJ", Inc. v.*

*Facebook, Inc.*, 144 F. Supp. 3d 1088 (N.D. Cal. 2015), and *Lancaster v. Alphabet Inc.*, 2016 U.S. Dist. LEXIS 88908 (N.D. Cal. July 8, 2016), challenged the editorial decision not to publish the content, not the unlawful and discriminatory application of a filtering tool intended only to protect children from offensive material that the provider had already agreed to publish.

Finally, section 230(c)(1) immunizes a defendant only with respect to "information provided by another content provider," not for information that the defendant provider develops itself. Defendants cannot avail themselves of this immunity if, as they argue, discriminatory censoring and labeling is content development. (MTD 14:27-15:2 (arguing that restricting videos communicates a message by impermissibly compelling "Google to speak in a manner deemed appropriate by Plaintiff"); *but see Fair Housing*, 521 F.3d 1157 (contributing to illegality makes computer service a content provider). Indeed, the CDA does not afford immunity to appending independent editorial commentary about someone else's content. *Hy Cite Corp. v. badbusinessbureau.com LLC*, 418 F.Supp.2d 1142, 1147-49 (D. Ariz. 2005) (creating editorial contents, titles and soliciting negative consumer reviews); *Diamond Ranch Academy, Inc. v. Filer*, 2016 WL 633351, *21-22 (D. Utah Feb. 17, 2016) (summaries of third-party statements with defendant's editorial comments and opinion); *Stevo Design, Inc. v. SBR Marketing Ltd.*, 968 F.Supp.2d 1082, 1090-91 (D. Nev. 2013) (misleading title of message board); *Hare v. Richie*, 2012 WL 3773116, *15-19 (D. Md. Aug. 29, 2012) (authoring comments to post); *Woodhull v. Meineil*, 145 N.M. 533, 540 (Ct. App. N.M. 2008) (adding own content to third-party submission and incorporating into larger posting); *Shiamili v. Real Estate Group of New York, Inc.*, 17 N.Y.3d 281, 291-93 (N.Y. Ct. App. 2011) (adding heading, subheading, and illustration could constitute content development); *see also Demetriades v. Yelp, Inc.*, 228 Cal.App.4th 294, 313 (Cal. Ct. App. 2014) (Yelp's misrepresentations about the accuracy of its review filtering software not immunized by the CDA against claims of unfair competition and false advertising); *Pirozzi v. Apple Inc.*, 913 F.Supp.2d 840, 849 (N.D. Cal. 2012) (allegations that Apple misled plaintiff as to the nature and integrity of its own products in the app store); *Mazur v. EBay, Inc.*, 2008 WL 618988, *10-11 (N.D. Cal. March 4, 2008) (negligence and fraud claims survived 230(c)(1) motion to dismiss based on eBay's own misrepresentations of the safety of its auction platform);

*Levitt v. Yelp,* 2011 WL 5079526, *9 (misrepresentations and omissions regarding manipulation of user ratings would not be immunized); *Anthony v. Yahoo! Inc.*, 421 F.Supp.2d 1257, 1263 (N.D. Cal. 2006) (implying that dating profiles belonged to active users); *Nunes v. Twitter*, 194 F.Supp.3d 959, 967 (N.D. Cal. 2016) (sending unwanted text messages); *Opperman v. Path, Inc.*, 87 F.Supp.3d 1018, 1044-45 (N.D. Cal. 2014) (allegations that Apple's terms of use encouraged app developers to harvest personal information without consent).

### 2.    Defendants Are Not Entitled To Immunity Under 230(c)(2)(B)

Defendants' other contention that subdivision (c)(2)(B) "squarely applies" to this case because PragerU's claims arise from Defendants' use of a filtering tool for the benefit of younger users does not comport with the immunity requirements of that provision.  (MTD 11:5-12). Section 230(c)(2)(B) immunity extends only to claims arising from providing others with "the technical means" to restrict access to material that "is obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  *See also Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 (9th Cir. 2009).  As PragerU makes clear in its complaint, the restricted videos at issue do not contain any such material.  (Compl., ¶¶ 7, 72).  Further, the conduct at issue in the Complaint includes human review and restriction of Plaintiff's videos, not providing others with the "technical means" to restrict objectionable content.  (Compl., ¶ 66).  Consequently, this case stands in sharp contrast to cases involving nondiscriminatory tools designed to protect viewers from malware, spyware and other objectively verifiable harmful material.

In *Zango,* a company sued a security company for blocking plaintiff's program as malicious software ("malware" or "spyware").  The court found that the blocked malware in question threatened to expose the user to objectively verifiable harm, including pornography or security risks.  *Id.* at 1174.  In so doing, the decision shows why subdivision (c)(2)(B) does not apply to this case.  Specifically*, Zango* found that if a consumer were unhappy with its security program, she could uninstall it and buy blocking software elsewhere.  That was possible because the end user could disable the filtering or blocking technology.  *See Zango,* 568 F.3d at 1177.  By contrast, Restricted Mode is embedded in YouTube and PragerU's target audience of students and young people cannot necessarily disable Restricted Mode or otherwise access the video in

OPPOSITION TO MOTION TO DISMISS

1  question.  (Compl., ¶¶ 14, 38, 41).  Consequently, *Zango*'s rationale that a consumer had

2  "[r]ecourse to competition" is inapplicable here.  568 F.3d at 1177.

3          Consequently, (c)(2)(B) immunity is not available to restrict appropriate content simply

4  because the provider has a motive to unreasonably designate that material "otherwise

5  objectionable" for purely discriminatory goals.  As many courts have explained, the term

6  "otherwise objectionable" does not mean anything that Defendants find objectionable, but refers to

7  offensive material similar to material that is found to be obscene, lewd, lascivious, filthy,

8  excessively violent, or harassing.  *Song fi Inc. v. Google, Inc.,* 108 F. Supp.3d 876, 883–84 (N.D.

9  Cal. 2015) (applying principle of *eiusdem generis* to limit catchall language to prevent restricting

10 materials merely because materials might pose a "problem" for YouTube); *Sherman,* 997

11 F.Supp.2d at 1138 (declining to "broadly interpret 'otherwise objectionable' material to include

12 any or all information or content"); *Goddard,* 2008 WL 5245490, at *6 (finding that information

13 "relat[ing] to business norms of fair play and transparency are . . . beyond the scope of §

14 230(c)(2)").  Indeed, were that not the case, the immunity law would fail on its face as a vague,

15 overbroad, and unconstitutional prior restraint on speech.  *See, generally, Reno v. American Civil*

16 *Liberties Union,* 521 U.S. 844 (1997).

17         Defendants' attempt to sidestep this problem by eliding the terms of the statute with their

18 Restricted Mode criteria also fails.  Even if Defendants' criteria and the CDA categories were the

19 same (which they are not), the Complaint alleges that Defendants do not abide by their criteria

20 when they apply Restricted Mode.  (Compl. ¶¶ 42, 52, 66-72; MTD 5:5-6:4).  Specifically,

21 Defendants use the criteria as a pretext to censor the speaker based on her identity and views not

22 the actual content of the speech.  (E.g., Compl., ¶ 4).  Those allegations alone are sufficient to

23 defeat Defendants' affirmative immunity claim at this stage of the proceedings.  *Idaho v.*

24 *Horiuchi*, 253 F.3d 359, 367–68 (9th Cir.), *vacated as moot,* 266 F.3d 979 (9th Cir. 2001)

25 (dismissal on the basis of an immunity defense is only proper if the facts supporting the immunity

26 are not in dispute, but where material facts are in dispute the non-moving party must be given the

27 benefit of all doubts, as to both basic facts as well as inferences to be drawn); *see also ASARCO,*

28 *LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014); *Garcia v. City of Merced*, 637

F.Supp.2d 731, 756-57 (E.D. Cal. 2008) (not resolving statutory immunity defense on motion to dismiss because facts were not clear whether immunity applied).

Finally, Defendants' insistence that PragerU's restricted video content is "objectionable" material that comes within subdivision (c)(2)(B) is inconsistent with the language and intent of that provision. As set forth above, eliminating any good faith basis for invoking the provision would render other immunity provisions, including (c)(2)(A), meaningless and unnecessary surplusage. *See e-Ventures,* 2017 WL 2210029 at *3; *but see Enigma Software Grp. USA v. Malwarebytes Inc.*, 2017 WL 5153698 (N.D. Cal. Nov. 7, 2017). Defendants' overbroad reading of (c)(2) immunity also eviscerates the Ninth Circuit's core premise in *Fair Housing* that the CDA immunizes only the provision of "neutral tools," not active involvement in discrimination. 521 F.3d 1157, 1169; *see also eDrop-Off Chicago LLC v. Burke*, 2013 WL 12131186, *24 (C.D. Cal. Aug. 9, 2013) (suggesting that provision of passwords to some users, but not others would be inconsistent with providing a "neutral tool").

### B.   Use Of A Purportedly Neutral Filtering Tool Is Not Protected Speech

Defendants' next argument that PragerU's assertion of its free speech interests "seeks to invert the protections that it provides," because "the First Amendment does not allow Plaintiff to force Google to display PragerU's videos to all," has been considered and rejected by the United States Supreme Court. (MTD 13:5-11, 14:27-28). In *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980), the U.S. Supreme Court expressly considered and rejected Defendants' claim that the First Amendment prevented a plaintiff from compelling a private party to allow otherwise protected speech to occur on the owner's premises. *Id.* In that case, the owner of the shopping center challenged, under the First and Fifth Amendments, the California Supreme Court's ruling that members of the public had a free speech right on private property operated as a public forum. In affirming the California Supreme Court's free speech ruling, the court stated that the property owner's "First Amendment right not to be forced by the State to use his property as a forum for the speech of others," or to compel "recitation of a message containing an affirmation of belief," was unpersuasive because the property owners were not "being compelled to affirm their belief in any governmentally prescribed position or view, and they are free to publicly dissociate

1   themselves from the views of the speakers." *Id.* at 88.

2          This case is no different.  Defendants hold YouTube out, operate it, and characterize the

3   website as a public forum for freedom of expression for all.  Consequently, their arbitrary and

4   capricious restriction and censorship of third party speech is subject to some level of judicial

5   scrutiny.  And any corresponding speech rights that may arise from Defendants' ownership of the

6   property do not preclude the relief sought by PragerU because competing speech rights of the

7   property owner are vindicated through the owner's ability to disassociate itself from the speech,

8   not through censorship of speech.  *Id.*  That is particularly true in this case because the unlawful

9   conduct arises not from Defendants' speech, but their use of a supposedly neutral technology tool

10  intended only to filter out obscene, lewd, lascivious, or violent content from reaching younger

11  viewers.  (MTD 1:27-2:7).

12         Defendants' reliance on a non-controlling district court case involving internet search

13  engines is misplaced and provides no legal or rational basis to ignore the Supreme Court's

14  decision in *Pruneyard*.  In *Zhang v. Baidu.Com., Inc.,* 10 F.Supp.3d 433 (S.D.N.Y. 2014) (and

15  cases cited therein), a district court from a foreign jurisdiction, considered the "circumstances"

16  under which the results of a search engine constituted protected speech.  10 F.Supp.3d at 433, 436

17  (noting that "only two courts appear to have addressed the question, both concluding (albeit with

18  somewhat sparse analysis) that search engine results are indeed protected by the First

19  Amendment" and that, at the time, the "Supreme Court has not addressed the precise question at

20  issue, its First Amendment jurisprudence"); *but see Packingham v. North Carolina*, 137 S. Ct.

21  1730, 1735, 198 L. Ed. 2d 273 (U.S. 2017) (Kennedy, J.) (stating that global social media websites

22  are the new town squares for public speech where the restriction of speech should receive more

23  than scant protection under the First Amendment); *Reno v. ACLU,* 521 U.S. at 868 (same).  In

24  making the determination, the Court relied upon the crucial distinction between the rights of a

25  traditional publisher that are implicated by search engine results on the one hand, and a neutral

26  infrastructure tool on the other.  Specifically, the communications and content of the search

27  engine's results were protected by the First Amendment because they "inherently incorporate the

28  search engine company engineers' judgments about what material users are most likely to find

1  responsive to their queries." *Zhang* at 438-39 (quoting Eugene Volokh & Donald M. Falk, *Google*

2  *First Amendment Protection for Search Engine Search Results,* 8 J.L. Econ. & Pol'y 883, 884

3  (2012) (analogizing a search engine to a "guidebook writer's judgments about which attractions to

4  mention and how to display them, and Matt Drudge's judgments about which stories to link and

5  how prominently to feature them" and reasoning "what is true for parades and newspaper op-ed

6  pages is at least as true for search engine output").[3] Thus, while, a search engine can under certain

7  circumstances implicate the free speech rights of its provider, operating "an infrastructure or

8  platform that delivers content in a neutral way" does not. *See Zhang*, 10 F.Supp.3d at 440

9  (quoting Oren Bracha & Frank Pasquale, *Federal Search Commission? Access, Fairness, and*

10  *Accountability in the Law of Search,* 93 Cornell L.Rev. 1149, 1192-97 (2008)).  And, the court in

11  *Zhang* went to lengths to make clear that it was not foreclosing liability for false statements about

12  search methodology or results.  10 F.Supp.3d at n.4.  In addition, Defendants operate YouTube as

13  a worldwide monopoly over video content in sharp contrast to the search engine operators in

14  *Zhang* who lacked "the physical power to silence anyone's voices, no matter what their alleged

15  market shares may be" because of the availability of multiple other engines that include results for

16  plaintiff's site.  *Id.* at 441; Compl. ¶¶ 2, 35-40.

17  This case is no exception.  Defendants tell users that YouTube is a passive platform that

18  allows its users to "publish" their speech, not the other way around: "You shall be solely

19  responsible for your own Content and the consequences of ***submitting and publishing your***

20  ***Content*** on the Service" and  "you affirm, represent, and warrant that you own or have the

21  necessary licenses, rights, consents, and permissions ***to publish Content you submit.***"  *See*

22  YouTube's *Terms of Service*, § 6.B, Exhibit 1 to Willen Declaration in Support of Motion to

23  Dismiss ("Willen Dec."), DKT #32-1 (emphases added).  As part of the infrastructure used to

24  operate the site, Defendants embed "Restricted Mode" into the web site solely for the purpose of

25

26  ---
[3] The court in *Zhang* also conceded that "whether any search engine is—or can be—the neutral conduit of information" not protected by the First Amendment under other circumstances "is open to question" that was not addressed.  10 F.Supp.3d at n.5.

27

28

1  protecting younger and sensitive viewers from "potentially mature content" by filtering and

2  restricting viewer access to obscene, lewd, offensive, or violent content.  (MTD 1:27-2:7).  In

3  other words, Defendants falsely tell YouTube users that Restricted Mode is intended to be used for

4  a viewpoint neutral purpose: to ensure that minors are protected from "potentially mature content."

5  (Compl., ¶ 104).

6      Finally, none of the cases cited by Google/YouTube involved social media websites

7  publicly dedicated to and/or operated as passive platforms for "freedom of expression" where

8  "*everyone's* voice can be heard."  (Compl., ¶¶ 3, 28).  Indeed most of cases relied on by

9  Defendants (and the court in *Zhang*) involve the free speech rights of traditional newspaper

10  publishers or event organizers dedicated to providing specific political and religious views and

11  opinions to its audience subject to substantial limitations of space and time.  *Zhang*, 10 F.Supp.3d

12  at 436–37.  Thus, none of the cases cited by Defendants holds (or implies) that the First

13  Amendment allows a computer service to use a supposedly neutral filtering tool as a pretext for

14  restricting access to appropriate content based on discriminatory animus.

15      In short, the First Amendment does not block the prosecution of claims of free speech,

16  discrimination, contract, and deceptive and unlawful business practices violations, let alone at the

17  pleadings stage.  Governments are free to regulate private property to ensure that the property is

18  not used to for illegal purposes, including discrimination, breach of contracts, or unfair, false, or

19  unlawful business practices.  *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 432

20  (1993), and such speech is not protected under the First Amendment.  *Hoffman v. Capital

21  Cities/ABC, Inc.*, 255 F.3d 1180, 1184-85 (9th Cir. 2001); *see also Perkins v. Linkedin Corp.*, 53

22  F.Supp.3d 1222, 1251-53 (N.D. Cal. 2014) (Koh, J.) (denying motion to dismiss 17200 unfair

23  competition claim involving misleading commercial speech); *American Bullion, Inc. v. Regal

24  Assets, LLC*, 2014 WL 7404597 (C.D. Cal. Dec. 30, 2014) (modifying injunction on Lanham Act

25  false advertising claim over First Amendment objection).  Were that not the case, the First

26  Amendment would prevent a victim of discrimination and other illegal conduct from remedying

27  wrongs simply because the offender operates an internet website.

28

OPPOSITION TO MOTION TO DISMISS

C.      **PragerU Has Sufficiently Alleged State Action**

Defendants' argument that they operate a private company whose actions are beyond the federal and California constitutions is based on the fallacy that "naked title" by itself is dispositive of state action. (MTD 16:4-5). As set forth in PragerU's Motion for a Preliminary Injunction, naked title does not control where, as here, Defendants characterize, operate, and dedicate YouTube as a public forum dedicated to freedom of expression to all. (PI Mtn. at 3-4; Compl., ¶ 28).

Defendants' reliance on several lower court cases for the proposition that the "quasi-state action" doctrine is limited only to shopping centers and expressly excludes online service providers is misplaced. (MTD 15:17-16:23). *First*, Defendants' contention that *Howard v. Am. Online Inc.*, 208 F.3d 741, 754 (9th Cir. 2000) stands for the proposition that the First Amendment "does not regulate private parties, including online service providers" is incorrect. (MTD 15:24-26). In *Howard*, the Ninth Circuit found only that constitutional claims brought against AOL in connection with fraud and other unlawful business practices failed on their face because "there [was] nothing in the record that supports the contention that AOL should be considered a state actor." 208 F.3d at 754. That is certainly not the case here. (*Compare* Compl. ¶¶ 2, 12, 27-28, 74-94 *and* Declaration of Peter Obstler in Support of PI Mtn., Exhibit A, DKT #27-1).

*Second*, Defendants' contention that PragerU "seeks to evade" the state action "rule by characterizing YouTube as some kind of public entity" is mistaken. (MTD 16:6-13). PragerU does not contend that YouTube is a "public entity" at all; only that Defendants operate the web site as a public forum for free speech. Under established federal and state constitutional law, a private property owner who operates its property as a public forum for speech is subject to judicial scrutiny under the First Amendment and Liberty of Speech clauses. *Marsh v. Alabama*, 326 U.S. 501, 502-503, 506 (1946); *Cornelius*, 473 U.S. at 801 (cited with approval in *Denver Area Educ. Tele Communications Consort., Inc. v. FCC*, 518 U.S. 727, 749-50 (1996) ("assuming public forums may include 'private property dedicated to public use'"); *Golden Gateway Ctr. v. Golden Gateway Tenants Assn.*, 26 Cal.4th 1013, 1022 (2001); *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 907–08 (1979), aff'd, 447 U.S. 74 (1980); *Fashion Valley Mall, LLC v. N.L.R.B.*, 42

1    Cal.4th 850, 869 (2007); *Ralphs Grocery Co. v. Victory Consultants, Inc.*, 17 Cal.App.5th 245, 258

2    (Cal. Ct. App. 2017), *as modified* (Nov. 6, 2017).  And this should come as no surprise to these

3    Defendants because social media service providers routinely petition the courts for anti-SLAPP

4    relief based on a claim that their websites are public forums.  *See*, *e.g.*, *Barrett v. Rosenthal*, 40

5    Cal.4th 33 (Cal. Ct. App. 2006); *see also Huntingdon Life Sciences, Inc. v. Stop Huntingdon*

6    *Animal Cruelty USA, Inc.,* 129 Cal.App.4th 1228 (Cal. Ct. App. 2005); *Wilbanks v. Wolk,* 121

7    Cal.App.4th 883, 895 (Cal. Ct. App. 2004); *ComputerXpress, Inc. v. Jackson,* 93 Cal.App.4th 993,

8    1007 (Cal. Ct. App. 2001); *MCSi, Inc. v. Woods,* 290 F.Supp.2d 1030, 1033 (N.D.Cal.2003);

9    *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1131, n.4 (Cal. Ct. App. 2003)  (meaning "of a Public

10    Forum was developed in, and has sole reference to, First Amendment cases.").[4]

11        **Third**, *hiQ Labs Inc. v. LinkedIn Corp.*, 2017 WL 3473663 (N.D. Cal. Aug. 14, 2017)

12    (Chen, J.) does not limit *Pruneyard* to shopping centers.  (MTD 17:4-25).  Judge Chen found only

13    that the cases holding internet sites to be public forums were made in the context of California's

14    anti-SLAPP statute that "protects conduct beyond constitutionally protected speech itself."  *Id.* at

15    *11.  But as discussed in PragerU's PI Motion (*see* PI Mtn. p. 17, n.25), a review of the opinion, as

16    well the briefs filed in that case, reveals that the parties failed to inform the court of the California

17    appellate decisions holding that a "public forum" under section 425.16 is expressly defined under

18    California law by "sole reference to[] First Amendment cases" and a "public forum" under section

19    425.16 is by definition a "public forum" under *Pruneyard*.  *Weinberg*, 110 Cal.App.4th at 1131 &

20    n.4; *see also Ralphs Grocery Co.*, 17 Cal.App.5th at 258, (holding that "any analysis under

21    *Pruneyard* [] must occur under the first prong of the anti-SLAPP analysis because the critical

22    inquiry is whether protected activity is challenged in the complaint") (internal citations omitted).

23        **Fourth**, the California Supreme Court has never limited *Pruneyard*'s application only to

24    shopping centers.  As discussed above, California, as well as some federal courts, have declared

25

26    _____
    [4] Defendants' reliance on *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6,

27    2017), a non-controlling district court opinion analyzing the issue under Delaware law, does not
    alter that result because, just as in *Howard*, the Court found only that "Plaintiff fails to plausibly
    claim that any of Defendants are state actors." *Id.*

28

1   websites, including Google and YouTube, to be "public forums." *See, e.g.*, *Twitter, Inc. v.*

2   *Sessions*, 263 F.Supp.3d 803 (N.D. Cal. 2017); *Barrett*, 40 Cal.4th 33 at n. 4, *Ralphs Grocery*, 17

3   Cal.App.5th at 528 (*Pruneyard* defines whether a website is a "public forum" to trigger free speech

4   protection under anti-SLAPP law).  Defendants' attempt to walk their "public forum" position

5   back in the non-SLAPP context by citing to cases involving claims directed solely against

6   shopping malls and traditional retail business defendants, therefore, has no bearing on whether a

7   website can be a public forum under federal or California law.  *See id; Packingham*, 137 S. Ct.

8   1730, 1737.

9   **D.    The Complaint States A Claim Under The Unruh Act**

10       Courts have long applied the Unruh Act's fundamental public policy against

11   discrimination, even in cases where business establishments' expressive, associational, and

12   religious interests are also present.  That is because minor infringements on First Amendment

13   activities do not justify sanctioning discrimination.  California's interest in preventing

14   discrimination is a compelling interest.  *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*,

15   481 U.S. 537, 548-49 (1987) (even if application of Unruh Act to compel admission of women

16   worked "some slight infringement on [the] right of expressive association," that infringement was

17   justified in light of the state's compelling interest in eliminating gender discrimination).  Words

18   alone may violate the Unruh Act, and an action under the Act will lie even if the words are

19   protected by the First Amendment: "the Unruh Act . . . can be violated in a number of ways by

20   words alone," when "the speech is meant to, and does, offend the law," because the "utterance of

21   the words themselves may be protected; but the speaker is subject to the consequences."  *Long v.*

22   *Valentino*, 216 Cal.App.3d 1287, 1296-98 (Cal. Ct. App. 1989), cert. denied, 498 U.S. 855 (1990)

23   (affirming) (Unruh Act judgment against speaker based on constitutionally protected speech used

24   to eject police officer from meeting open to the public).

25       To establish a First Amendment defense against the Unruh Act based on a theory of

26   compelled speech, Defendants would have to demonstrate that the act of restricting or not

27   restricting videos constitutes an "expressive activity," and that unrestricting Plaintiff's

28   unobjectionable videos would cause the public to associate Defendants with "discordant views."

1    *U.S. Western Falun Dafa Ass'n v. Chinese Chamber of Commerce*, 163 Cal.App.4th 590, 606

2    (Cal. Ct. App. 2008).  Because Defendants intend Restricted Mode as a viewpoint neutral filtering

3    tool, Google/YouTube have not demonstrated how restricting videos because of political or

4    religious viewpoint constitutes "expressive activity," how PragerU's videos express views

5    contrary to YouTube's expressive activity, or how unrestricting Plaintiff's videos would lead the

6    public to associate their content with Defendants.  *See N. Coast Women's Care Med. Grp., Inc. v.*

7    *San Diego Cty. Superior Court*, 44 Cal.4th 1145, 1157 (Cal. Ct. App. 2008).  As the U.S. Supreme

8    Court has made clear, if Defendants truly believe that unrestricting videos sends a political or

9    religious message to the public they do not endorse then their remedy is to dissociate from the

10   view, not censor the speech.[5]  *Pruneyard,* 447 U.S. at 88.

11         Finally, Defendants' characterization of the allegations in this case as "threadbare

12   conclusions of discriminatory bias" that "do not suffice" to state a plausible case of intentional

13   discrimination is mystifying.  (MTD 7:22-8:8, 19:11-18).  As a threshold matter, there is no

14   heightened pleading standard for improper motive in constitutional tort cases.  *Galbraith v. County*

15   *of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir. 2002).  And under *Iqbal*, Plaintiff need only

16   offer facts "tending to exclude" Defendants' alternative explanation, thereby rendering the

17   Complaint's allegations plausible.  *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751

18   F.3d 990 (9th Cir. 2014); *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) (holding that

19   *Iqbal* does not require claim to be "true or even probable," only that it "plausibly suggest an

20   entitlement to relief" and dismissal is proper only when the defendant's "plausible alternative

21   explanation is so convincing that plaintiff's explanation is *im*plausible") (emphasis in original).

22         The Complaint alleges that PragerU's compliant videos were restricted whereas videos on

23   similar subjects, including non-compliant videos (from a non-conservative viewpoint or speaker),

24   were not.  (Compl., ¶¶ 47, 72, 83).  Where speakers are engaged in similar or identical conduct but

---

[5] To the extent that Defendants claim that dissociation is insufficient to cure forced association
with "discordant views," that is a disputed issue of fact that cannot be resolved on a motion to
dismiss.  *See Stevens v. Optimum Health Inst.*, 810 F.Supp.2d 1074, 1093-95 (S.D. Cal. 2001)
(whether to allow service dog where organization insisted that animals would defile sacred space
was issue of material fact as to whether application of Unruh Act violated First Amendment rights
to free expressive association).

1   treated differently, that raises a plausible inference that they are victims of viewpoint

2   discrimination.  *See*, *e.g.*, *Hightower v. City and County of San Francisco*, 77 F.Supp.3d 867

3   (N.D. Cal. 2014); *Cuviello v. City and County of San Francisco*, 940 F.Supp.2d 1071 (N.D. Cal.

4   2013); *Seidman v. Paradise Valley Unified School Dist. No. 69*, 327 F.Supp.2d 1098, 1112 (D.

5   Ariz. 2004).  Plaintiff's allegations of differential treatment, alone, make dismissal on the

6   pleadings inappropriate. *See Kirbyson v. Tesoro Refining and Marketing Co.*, 2010 WL 2382395,

7   *3 (N.D. Cal. June 10, 2010) (allegations of different treatment raised a plausible inference that

8   plaintiff was victim of discrimination, making dismissal on pleadings "inappropriate" and

9   "premature"); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147-48 (9th Cir. 2005).

10      **E.      The Complaint States A Cause Of Action For Unfair Competition**

11          Defendants argue that Plaintiff's UCL claim fails under any theory, whether unlawful,

12   unfair or fraudulent.  (MTD 19:20-28).  Defendants are mistaken.  Their contention that PragerU

13   fails to identify false or misleading statements with sufficient particularity, or allege reliance, is

14   refuted by allegations of (i) Defendants' own statements claiming to operate a forum for "freedom

15   of expression" for all "no matter [] their age or point of view" and helping to grow an audience

16   (Compl., ¶¶ 3, 28, 112); (ii) false statements to the public that Restricted Mode is intended only as

17   a viewpoint neutral tool to restrict mature content according to their guidelines (Compl., ¶¶ 4, 41-

18   46); and (iii) the statements Defendants make about Plaintiff's videos when they are restricted

19   (*e.g.*, Compl., ¶¶ 14, 104).  The Complaint also alleges that Defendants made such representations

20   for the purpose of inviting the public to use its forum, and upon which PragerU, as well as other

21   content creators, advertisers, and the public at large, relied when they post or view video content

22   on the site.  (Compl, ¶¶ 11, 104).  PragerU also asserts its UCL claims as both a competitor and a

23   consumer.  PragerU competes with Defendants' video content and is also a user of YouTube's

24   platform and services.  (E.g., Compl., ¶¶ 97, 116).  And because the Complaint alleges there is no

25   utility for Defendants' actions and, even if one did exist, that it is outweighed by the injury to the

26   consuming public, the Complaint easily passes the balancing test where the harm to the victim

27   outweighs any utility that might arise from Defendants reasons, justifications, or motives for

28   restricting PragerU's content.  *See e.g.*, *Progressive West Ins. Co. v. Yolo Super. Ct.*, 135

1   Cal.App.4th 263 (Cal. Ct. App. 2005); Compl., ¶105.

2       Similarly, Defendants' contention that PragerU alleges only individualized injury with no

3   impact on competition is not true.  (MTD 20:13-23).  All content creators, including PragerU,

4   compete with other speakers including Defendants for the public's attention for advertising

5   revenue and to participate in the marketplace of ideas.  (Compl., ¶¶ 27, 97, 104, 116, 118).  But

6   unbeknownst to viewers who come to YouTube reasonably expecting an open and viewpoint-

7   neutral experience, Defendants illegally suppress otherwise appropriate video content so that often

8   viewers may not even know the video exists on the platform.  Consequently, in contrast to the

9   individual lone actor in *Anesthesia Serv. Medical Group, Inc.*, 200 Cal.App.4th 480 (Cal. Ct. App.

10  2011), Defendants' abuse of their global monopoly on video streaming and advertising harms

11  competition for the millions of people and organizations who rely on YouTube for their

12  operations.

13      **F.      The Complaint States A Breach Of The Implied Covenant**

14      Defendants accuse Plaintiff of attempting to enforce "some general public policy interest

15  not directly tied to the contract's purposes."  (MTD 21:6-8).  That argument is not plausible.

16  PragerU merely seeks the ability to speak on YouTube free from discrimination, which is the very

17  service that Defendants offered in exchange for the revenue generated from Plaintiff's videos.

18  Defendants cannot truly argue that being the subject of discrimination on the basis of its identity,

19  politics, and/or speech was something within Plaintiff's reasonable expectations when it

20  contracted with Defendants.  And Defendants' argument that because their actions were

21  "expressly authorized" under the contract fares no better because Defendants have no contractual

22  right to restrict content that complies with all applicable terms and policies, simply because they

23  dislike the viewpoint or identity of the content creator.  *See* Compl., ¶ 104; *see also Spy Phone*

24  *Labs LLC v. Google Inc.*, 2016 WL 6025469 (N.D. Cal. Oct. 14, 2016).  The terms of use that

25  Defendants cite do not clearly give them the right to discriminate against a particular user and

26  violate Defendants' public representations that YouTube is a platform for freedom of expression

27  for all or that Restricted Mode only blocks content harmful to younger viewers.  *See Darnaa, LLC*

28  *v. Google, Inc.*, 2015 WL 7753406 (N.D. Cal. Dec. 2, 2015) (finding YouTube terms of use

1   ambiguous and applying implied covenant); *Darnaa LLC v. Google, Inc.*, 2016 WL 6540452

2   (N.D. Cal. Nov 2, 2016) (contractual right to remove content would not apply if allegations of

3   impermissible intent could be proven).

4        *Storek & Storek, Inc. v. Citicorp Real Estate*, 100 Cal.App.4th 44 (Cal. Ct. App. 2002), and

5   the other cases cited by Defendants do not square Defendants' conduct with their express or

6   implied contractual representations.  In *Storek*, the court found that where a contract reserves to

7   one party the right to exercise discretion, there must be a limit to that discretion in order to avoid

8   rendering the promise illusory and the contract void for lack of consideration.  *Storek* at 57-59.

9   And when  discretion exercised under a contract is a matter of *subjective judgment,* then that

10   discretion is bounded by the duty of good faith.  *Id.* at 60-61; (*see also* MTD at 2:4 ("difficult,

11   subjective judgment calls") and 5:21 ("inherently subjective and context-specific judgments"));

12   *see also Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, n.18 (2000) (implied covenant will not impose

13   duties beyond those contemplated, but a party employing "pretext" to deprive the other of a

14   contract benefit to which he was clearly entitled would violate the implied covenant).  Similarly,

15   Defendants' reliance on the limitation of liability clause does not immunize Google/YouTube

16   from intentional violations of law or wrongdoing, including the intentional and tortious breach of

17   the implied covenant alleged in the Complaint.  (Compl., ¶ 112); *see also Spy Phone Labs LLC*,

18   2016 WL 6025469; *Darnaa , LLC v. Google, Inc.*, 2015 WL 7753406 (N.D. Cal. Dec. 2, 2015);

19   *Darnaa, LLC v. Google, Inc.*, 236 F.Supp.3d 1116 (N.D. Cal. 2017).

20        **G.        The Complaint States A Claim Under The Lanham Act**

21        Defendants' argument that the Lanham Act claim fails because PragerU does not

22   "adequately identify any purportedly false statements" made for the purpose of influencing

23   creators and viewers to utilize its service is wrong for the same reasons that its UCL argument is

24   wrong.  (MTD 23:2-24:17).  As Defendants concede, the Complaint references YouTube's

25   policies and guidelines and identifies numerous specific statements by Defendants, including the

26   purported viewpoint neutrality of Restricted Mode that Defendants use to solicit users under the

27   guise of "freedom of expression" for all.  (Compl., ¶¶ 3, 11, 14, 28, 104, 112).  And, contrary to

28   Defendants' assertion, the Complaint adequately pleads economic and reputational injury

1  stemming from Defendants' misrepresentations about how YouTube governs the land of the "Four

2  Freedoms" without viewpoint bias.  And when Defendants restrict videos, they send clear but false

3  signals to all users and controllers of Restricted Mode that PragerU's videos contain content that is

4  inappropriate for younger viewers, thereby injuring Plaintiff's  brand, reputation, goodwill,

5  viewership, revenue, and ability to attract younger viewers to its educational videos.  (Compl., ¶¶

6  84, 100, 118.)

7  **IV.    CONCLUSION**

8      For the reasons set forth above, PragerU respectfully requests that the Court deny

9  Google/YouTube's Motion to Dismiss in its entirety.

10  DATED:  February 9, 2018              Respectfully submitted,

11                                    BROWNE GEORGE ROSS LLP
                                        Peter Obstler
12                                      David S. Wakukawa

13

14                              By:      /s/ Peter Obstler
                                        Peter Obstler
15                              Attorneys for Plaintiff PRAGER UNIVERSITY

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS